IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES | : | CRIMINAL ACTION |
| of AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| AXEL GOMEZ | : | No. 10-321 |

**MEMORANDUM**

PRATTER, J.                                                                                                       SEPTEMBER 5, 2012

**INTRODUCTION**

Defendant Axel Gomez was indicted on May 12, 2010. A superseding indictment filed on November 10, 2010 charged Mr. Gomez with (1) conspiracy to distribute more than one kilogram of heroin and more than 500 grams of cocaine, in violation of 21 U.S.C. § 846; (2) distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1); (3) six counts of distribution of heroin, in violation of 21 U.S.C. § 841(a)(1); (4) possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c); and (5) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). Mr. Gomez now moves to suppress evidence obtained through the use of pen registers, trap and trace devices, wiretaps, and global positioning system devices. Oral argument on the motion was held on August 29, 2012, and the matter is now ripe for decision.

**FACTUAL BACKGROUND**

After multiple cooperating individuals informed DEA agents that Defendant Axel Gomez was selling heroin and cocaine, the DEA arranged a controlled purchase of 20 grams of heroin from Mr. Gomez, using one of those cooperators. The cooperator then informed the DEA that

Mr. Gomez had given him his cell phone number.[1]  To further its investigation, the DEA applied for and was granted a court order allowing it to install a pen register and a trap and trace device on that cell phone.  It began tracking the incoming and outgoing calls from Mr. Gomez's phone on July 9, 2009.

On July 30, 2009, Mr. Gomez gave another cooperating individual a sample of heroin, supplied him with the same cell phone number given to the previous cooperator, and directed him to use certain code words when calling about drugs.  This led to a series of phone calls, which were recorded by the DEA with the cooperator's consent, about heroin purchases between the cooperating individual and Mr. Gomez, as well as another controlled purchase of heroin.

Based on the information obtained from the pen register and trap and trace device, the controlled purchases, and recorded conversations,[2] Judge Gardner of this District authorized the interception of wire communications to and from Mr. Gomez's cell phone.  The DEA began intercepting calls on August 24, 2009, and ended on September 12, 2009, when Mr. Gomez stopped using that cell phone.  In September, 2009 and then again in October, 2009, based on recorded conversations and controlled purchases, Judge Jones of this District authorized the

---

[1] Mr. Gomez notes that the DEA stopped using this particular cooperator because of suspicions that he was engaging in drug trafficking activity.  He also had prior convictions for drug offenses and forgery.  This information was included in the wiretap affidavit dated August 24, 2009.

[2] In addition to the recorded conversations between Mr. Gomez and the cooperating individual, DEA agents working on another drug investigation recorded a call between Mr. Gomez's cell phone and a telephone used by a New York suspect.  The call involved a coded conversation about a monetary amount or an amount of drugs and led to the recovery of 30 kilograms of heroin from the New York caller.

interception of communications over another telephone used by Mr. Gomez.[3]

On January 8, 2010, Magistrate Judge Rueter issued a search warrant authorizing the DEA to search Mr. Gomez's apartment for drugs, packaging material, weapons, cash, and the like. The affidavit of probable cause included information about controlled purchases, intercepted calls and surveillance of Mr. Gomez's apartment. The calls revealed that Mr. Gomez met with someone at his apartment on September 3, 2009 to sell that person two kilograms of cocaine. They also revealed that on October 30, 2009, a customer of Mr. Gomez's told him that law enforcement was outside his apartment, prompting him to instruct one of his workers to clean the drug trafficking evidence out of his apartment. However, Mr. Gomez later called the customer back to tell him that he had checked around his apartment and not seen law enforcement and that he would be able to go ahead with the deal.

The affidavit also detailed the DEA's visual surveillance of Mr. Gomez. This surveillance revealed, among other things, that Mr. Gomez traveled between his apartment and a suspected stash house, and that as late as January 5, 2010, Mr. Gomez entered that stash house, shortly thereafter exited the house with another man, opened the trunk of his car, and after a brief period of time closed the trunk and departed, which the affiant believed was consistent with a drug transaction. Additionally, the affidavit included data obtained through GPS monitoring of Mr. Gomez's car, which showed that he was frequently at his apartment. The GPS device in question was installed without a warrant.

On January 11, 2010, DEA agents executed the search warrant. They found $5,937 in

---

[3]  Shortly before this, the DEA applied for and was granted a court order authorizing the use of a pen register and trap and trace device on this second cell phone.

cash in Mr. Gomez's bedroom and hall closet; a heat sealer, digital scale, bag of rubber bands, and a bottle containing white powder in his kitchen; and a .40 caliber Sig Sauer handgun with an obliterated serial number loaded with eight live rounds of hollowpoint ammunition in the drawer below the oven.  Mr. Gomez now moves to suppress this evidence, as well as all of the evidence obtained through the pen registers, trap and trace devices, GPS device, and wiretaps.

**DISCUSSION**

First, Mr. Gomez argues that the Government should have obtained a warrant to install the pen register and trap and trace devices, and that because it did not, all of the evidence that was obtained as a result of use of those devices, including wiretap information, should be suppressed.  He relies heavily on Justice Sotomayor's concurrence in *Jones v. United States*, 132 S. Ct. 945, 957 (2012), in which she expressed a willingness to reconsider the so-called third party doctrine, i.e., whether individuals have an expectation of privacy in information voluntarily disclosed to third parties.  He also argues that although *Smith v. Maryland*, 442 U.S. 735 (1979), explicitly allowed the use of pen registers without a warrant, technology has changed so much since 1979 that the Supreme Court could not possibly have contemplated the wealth of information now available through the use of pen registers when making that decision, suggesting that *Smith* should somehow be put on the shelf.

To rule in favor of Mr. Gomez with respect to the pen registers and trap and trace devices, this Court would have to ignore Supreme Court precedent and rule that two statutes – the Stored Communications Act, 18 U.S.C. §§ 2701-2711, and the pen register statute, 18 U.S.C. §§ 3121-3127 – are unconstitutional based on a solo concurrence in a case devoted to an entirely different topic and a policy argument.  Beginning with Mr. Gomez's reliance on Justice Sotomayor's

4

concurrence in *Jones*, the Court notes that this was only a concurrence, and one in which no other justices joined. Thus, Justice Sotomayor's potential willingness to reconsider the third party doctrine says very little about how the Supreme Court as a whole would view such a challenge, and certainly does not give a district court much comfort in making a decision that would directly conflict with long-established Supreme Court precedent. Moreover, while the Court appreciates that times have certainly changed since 1979, it is nevertheless still bound by the holding in *Smith*. If district courts were to reconsider every Supreme Court decision each time a technological change occurred that could arguably impact that decision, the rule of *stare decisis* would soon become meaningless in favor of a rule of obsolescence. Thus, the Court will not suppress the information obtained through pen registers and trap and trace devices. Because the wiretap orders were based directly on this information, the Court will also not order the suppression of evidence obtained through wiretaps.

  Turning next to the issue of GPS evidence, Mr. Gomez argues that it, too, must be suppressed, in light of *Jones*. The Government responds that it does not intend to offer the evidence at trial, so any argument relating to the suppression of the GPS evidence itself is moot. That does not entirely solve the problems relating to the GPS evidence, however, as that evidence was used in the affidavit of probable cause on which the search warrant for Mr. Gomez's residence was based.

  Even assuming that the GPS evidence was illegally obtained because the GPS monitoring took place without a warrant, the search warrant in this case was still valid. If a search warrant contains illegally obtained evidence, the search warrant is still valid if the magistrate would have issued the warrant absent the tainted evidence and if the tainted evidence did not prompt the

agents to obtain the warrant. *See United States v. Perez*, 280 F.3d 318, 339 (3d Cir. 2002) (quoting *United States v. Herrold*, 962 F.2d 1131, 1144 (3d Cir. 1992)). In this case, the GPS evidence did not prompt the agents to obtain the warrant – the wiretap, controlled purchases, and surveillance evidence did that.

To answer the question of whether the warrant would have issued absent the GPS evidence, the Court must assess whether the search warrant was supported by probable cause if the GPS evidence was excised from the affidavit of probable cause. A court must uphold a search warrant if the issuing magistrate had "a substantial basis," looking at the totality of the circumstances, for finding that probable cause existed for the search. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Here, the GPS data adds some additional detail to the affidavit regarding Mr. Gomez's whereabouts and tying him to his apartment, but the primary details relating to Mr. Gomez's activities were drawn from other sources, such as corroborators, the wiretap evidence, controlled purchases, and visual surveillance unrelated to the GPS data.

Looking solely at the non-GPS evidence, then, the Court must address Mr. Gomez's argument that the warrant was based on "stale" evidence because it was issued a few months after any known drug dealing took place there and after Mr. Gomez said he was going to clean out his apartment because of suspected police surveillance. Probable cause, however, only requires that there be a "fair probability that contraband or evidence of a crime will be found in a particular place," not that it is more likely than not that evidence of a crime is located at that place. *Gates*, 462 U.S. at 238. Moreover, according to the Third Circuit Court of Appeals, "[o]ur Court, and several other courts of appeals, have held that evidence ... is likely to be found where the [drug] dealers reside." *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002)

6

(internal quotation omitted; alteration in original).

While Mr. Gomez is correct that searching a drug dealer's home is unreasonable if there is no reason to think that the home contained any contraband, *see* Def.'s Mot. at 19 (quoting *United States v. Stearn*, 597 F.3d 540, 559 (3d Cir. 2010)), that is simply not the case here.  Here, the affidavit included evidence that Mr. Gomez engaged in activities consistent with drug trafficking as late as a few days before the issuance of the warrant and that although, having been alerted to possible surveillance, he said he was going to clean out his apartment, he later said that the coast was clear and that he would continue with a drug deal at his apartment.  Moreover, it is unchallenged that the affiant recounted that Mr. Gomez had on multiple occasions in the past used his home for drug-related activities.  The affidavit, with or without the GPS data, contained ample information linking Mr. Gomez's apartment to drug dealing activities, from which a magistrate judge could conclude that there was a "fair probability" that evidence of drug trafficking would be found at the apartment.  Thus, the Court will not secondguess the magistrate and will not suppress the fruits of the search warrant in this case.

### CONCLUSION

For the reasons set forth above, the Court will deny Mr. Gomez's Motion to Suppress. An Order to this effect follows.

BY THE COURT:

　/s/ Gene E.K. Pratter　
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE